UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
+++++++++++++++++++++++++++++++++++++++++++++++++++

**BANNER INDUSTRIES OF N.E., INC.,**

                                        **Plaintiff,**


                    **-v-**                              **1:11-CV-1537**

**KENNETH L. WICKS and HARRINGTON
INDUSTRIAL PLASTICS LLC,**

                                        **Defendants.**

+++++++++++++++++++++++++++++++++++++++++++++++++++

APPEARANCES:

McNamee, Lochner, Titus & Williams, P.C.
Glen P. Doherty, Esq., of counsel
677 Broadway
Albany, New York 12207-2503
and
Regnante, Sterio Law Firm
Laura R. McKelligott, Esq., of counsel
Seth H. Hochbaum, Esq., of counsel
401 Edgwater Place, Suite 630
Wakefield, Massachusetts 01880
Attorneys for Plaintiff

Littler, Mendelson P.C.
Kevin M. Duddlesten, Esq., of counsel
Stephen T. Melnick, Esq., of counsel
One International Place, Suite 2700
Boston, Massachusetts 02110
and
Littler, Mendelson P.C.
Andrew P. Marks, Esq., of counsel
900 Third Avenue
New York, New York 10022


**Hon. Norman A. Mordue, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

Defendants move (Dkt. No. 95) for summary judgment in this action arising from restrictive covenants in an employment contract and a subsequent settlement agreement signed by defendant Kenneth L. Wicks ("Wicks") in connection with his employment by plaintiff Banner Industries of N.E., Inc. ("Banner"). Wicks left Banner's employ in 2009 and is currently employed by defendant Harrington Industrial Plastics LLC ("Harrington"). On May 8, 2012, this Court denied Banner's motion for a preliminary injunction (Dkt. No. 25), and the parties proceeded with discovery. As set forth below, the Court directs Wicks to return to Banner all copies of Banner documents remaining on Wicks' hard drive and to delete all such information from the hard drive. In all other respects defendants' motion for summary judgment dismissing the action is granted, and the action is dismissed with prejudice.

## COMPLAINT

The complaint (Dkt. No. 1) was filed in Massachusetts Superior Court, removed to United States District Court, District of Massachusetts, and transferred to this district. It states that Banner "is a multiline retail distributor of high purity components, including valves, tubing, gauges and many other flow components that are used in the industrial and high purity industries, with a particular emphasis on the semiconductor, solar and vacuum industries"; that it has been in business since 1979; and that it has offices in Massachusetts, Pennsylvania, Virginia, North Carolina, Florida, New York, Texas, Utah, and the Republic of Singapore.

Wicks began working for Banner in 2005 as its National Sales Manager. At the time of his hiring, Wicks signed an agreement ("Employment Agreement") dated August 12, 2005, stating:

> (a) [Wicks] will not supply or divulge to any person, firm, association, business or Corporation any of [Banner's] methods of conducting or obtaining

> business, confidential information or trade secrets ... after [Wicks'] term of
> employment is terminated.
> ***
> (c) [Wicks] agrees that for a period of (3) years following termination of this
> Agreement, [Wicks] shall not directly or indirectly be engaged in or become
> interested in or serve as officer or director or employee of any business
> substantially similar to that being conducted by [Banner] in any area in which
> [Banner] conducts business.

The complaint lists Wicks' responsibilities at Banner and asserts that Wicks had "complete and unfettered access to confidential and sensitive data developed and protected by Banner[.]"

Wicks voluntarily left Banner's employ in September 2009. The complaint alleges: "Upon separation from his employment with Banner, Wicks claimed that he was owed compensation by Banner, a claim which Banner denied and continues to deny." On November 11, 2009, Banner and Wicks entered into a Settlement Agreement and General Release ("Settlement Agreement") pursuant to which Banner agreed to pay Wicks $100,000 in bimonthly installment payments of $2,000 from December 1, 2009 to December 15, 2011.[1] Wicks agreed to "continue to adhere to all obligations undertaken by him under any nondisclosure agreement, any non-competition agreement, any non-solicitation agreement and any confidentiality agreement which he has signed and delivered to Banner, which agreements shall remain in full force and effect[.]"

On February 16, 2011, Wicks informed Gary P. Richard, Banner's Treasurer, by email that he "may do some limited product representation" but would be "cautious based on our agreement." On March 16, 2011, he emailed Richard that he may sell "cryogenic materials..., a product that has no overlap with Banner" and added: "I expect that most of my initial applications

---

[1] It is undisputed that Banner has made all payments due under the settlement agreement.

will be cryogenic and steam – again both outside of the typical applications that I worked with at Banner."

On August 19, 2011, Banner's attorney wrote letters to Wicks' lawyer Richard F. Ricci, Esq., and Harrington's Chief Executive Officer James Swanson, stating that Banner recently learned that Wicks would begin employment with Harrington on August 22, 2011; notifying Harrington of Wicks' 2005 Employment Agreement with Banner; observing that Harrington is one of Banner's "largest national competitors"; and asserting that Banner expects Wicks to honor his obligations under the Employment Agreement.

On or about August 22, 2011, Wicks commenced employment at Harrington as a Technical Sales Representative.  The complaint alleges that, like Banner, Harrington is a retail distributor of high purity components, including valves, vacuum fittings, tubing and gauges that are used in the high technology manufacturing industry, particularly in the semiconductor industry; that Banner and Harrington actively compete for customers in every market in which they coexist; that, like Banner, Harrington has offices in Pennsylvania, North Carolina, Florida, and Utah; that Harrington recently acquired businesses in New York and Texas that allow it to be involved in the semiconductor industry in those States, in which Banner has an established presence; and that the aforesaid acquisitions allow Harrington to have a stronger presence in the high purity semiconductor manufacturing market, an area where Banner has an established and strong presence.  Banner further alleges that Harrington and Wicks deprived Banner of the opportunity to continue to represent a manufacturer, Asahi/America, Inc. ("Asahi"), in New York, resulting in lost sales opportunities for Banner and gained sales for Harrington.

The complaint alleges that Wicks has breached the August 12, 2005 Employment

-4-

Agreement "by working for Harrington, a competitior of Banner, by soliciting and taking away plaintiff's customers and clients, former customers and clients, and by using confidential information of Banner for his own benefit and for the benefit of Harrington." The complaint sets forth causes of action against Wicks for breach of the Employment Agreement; breach of the Settlement Agreement; breach of the covenant of good faith and fair dealing; conversion; and fraud. It also sets forth a cause of action against Harrington for tortious interference with contract.        The complaint requests money damages against Wicks and Harrington. It further seeks an injunction enjoining Wicks from continuing his employment with Harrington or from "engaging in, having an interest in, being employed by or being in any way connected with (as a consultant, independent contractor or otherwise) any company or entity which is a retail distributor of high purity components, including valves, vacuum fittings, tubing and gauges that are used in the high technology manufacturing industry, particularly in the semiconductor industry, anywhere in the United States through September 16, 2012"; from "directly or indirectly soliciting, diverting or taking away any of Banner's customers or clients, former customers or clients, prospects or vendors or patronage of such customers or clients, former customers or clients, prospects or vendors, through September 16, 2012"; and from disclosing any confidential information of Banner. Banner also requests that the Court order Wicks to return any and all documents, materials or other property of Banner forthwith and refund to Banner all sums paid under the Settlement Agreement. Finally, Banner asks the Court to enjoin Harrington from retaining Wicks as an employee, consultant or independent contractor and from using "any confidential information, trade secrets, customer lists, vendor lists or financial information or any other confidential trade secret or private financial information of Banner regarding the business of

-5-

Banner" that Harrington obtained from Wicks.

## DISCUSSION

### Standard on Summary Judgment

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When deciding a summary judgment motion, the court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999). A motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157-58 (2d Cir. 2000). Here, the parties do not dispute the meaning of any contract terms.

### Counts One and Two

The Court now turns to consider Banner's claims. Count One of the complaint, "Breach of the Agreement," alleges:

> 43. On or about August 12, 2005, in consideration of his employment with Banner, Wicks made, executed and delivered to Banner the [Employment] Agreement....
> 44. On or about September 16, 2009,Wicks voluntarily separated from his employment with Banner as National Sales Manager and thereafter went to work for one of Banner's largest competitors, Harrington.
> 45. Wicks has breached the [Employment] Agreement by working for Harrington, by soliciting and otherwise doing business with customers,

vendors and former customers, vendors and clients of Banner, and by using
confidential information of Banner for his own benefit and for the benefit of
Harrington.

46. As a direct and proximate result of Wicks' actions, Banner is suffering,
and will continue to suffer, irreparable harm and damages.

Count Two, "Breach of the Settlement Agreement," claims:

48. On or about November 11, 2009, in consideration of Banner's payment in
the gross sum of One Hundred Thousand Dollars ($100,000.00) to Wicks,
Wicks was bound by the Settlement Agreement ... to "continue to adhere to
all obligations undertaken by him under any nondisclosure agreement, any
non-competition agreement, any non-solicitation agreement and any
confidentiality agreement which he has signed and delivered to Banner ..."

49. In accordance with the terms of the Settlement Agreement, Banner has
made, and continues to make, payments to Wicks in the bimonthly sum of
Two Thousand Dollars ($2,000.00).

50. In accordance with the terms of the Settlement Agreement, Wicks has
received and accepted, to date, the gross sum of Ninety Six Thousand Dollars
($96,000.00) from Banner.

51. Wicks has breached the Settlement Agreement by failing, refusing and
neglecting to adhere to all of the obligations undertaken by him under the
Agreement.

52. As a direct and proximate result of Wicks' actions, Banner is suffering,
and will continue to suffer, irreparable harm and damages.

Count One is based on the Employment Agreement's restrictive covenants, which are

incorporated by reference into the Settlement Agreement and which form the basis of Count Two.

The Court addresses these two counts together.

In moving for summary judgment, defendants first argue that the restrictive covenants are

not binding on Wicks because Banner breached the Employment Agreement "by paying [Wicks]

only a fraction of the commissions owed to him in 2007 and 2008, then by unilaterally reducing

his pay 20 percent in January 2009." According to defendants, this breach by Banner released

Wicks from his obligations under the Employment Agreement, and the Settlement Agreement

"could not resurrect the already-breached and voided [Employment] Agreement or the covenants

-7-

contained in it." The Court disagrees. In the Settlement Agreement, Wicks agreed to "continue to adhere to all obligations undertaken by him under any nondisclosure agreement, any non-competition agreement, any non-solicitation agreement and any confidentiality agreement which he has signed and delivered to Banner, which agreements shall remain in full force and effect[.]" Regardless of whether the Employment Agreement was valid, void, or voidable prior to the November 11, 2009 Settlement Agreement, Wicks bound himself to the nondisclosure and non-competition obligations contained in the Employment Agreement when he entered into the Settlement Agreement and accepted benefits thereunder.

Defendants further argue that the restrictive covenants are unenforceable because they do not protect Banner's legitimate interests and are not reasonable as to time, space, or scope, and because Banner has no evidence that any breach by defendants caused harm to Banner. Discussing New York law, which undisputedly applies on this motion, the Second Circuit explains:

> New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy favoring robust and uninhibited competition, and powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood. Thus, a restrictive covenant will be rigorously examined and enforced only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists or confidential customer information, to protect the good will of the employer's business, or perhaps when the employer is exposed to special harm because of the unique nature of the employee's services. Only after determining that a restrictive covenant would serve to protect against such unfair and illegal conduct and not merely to insulate the employer from competition, does the reasonableness of the covenant in terms of its time, space or scope, or the oppressiveness of its operation become an issue.

*American Inst. of Chem. Eng'rs. v. Reber-Friel Co.*, 682 F.2d 382, 386-87 (2d Cir. 1982) (citations, footnotes, and quotation marks omitted). With respect to the reasonableness of such

covenants, New York's high court states:

> New York has adopted [the modern, prevailing common-law] ... standard of reasonableness in determining the validity of employee agreements not to compete. In this context a restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.

*BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999) (citation and quotation marks omitted).

The Court addresses these issues below.

### Subdivision (a)

The Court first considers subdivision (a) of the Employment Agreement, which states:

> [Wicks] will not supply or divulge to any person, firm, association, business or Corporation any of [Banner's] methods of conducting or obtaining business, confidential information or trade secrets ... after [Wicks'] term of employment is terminated.

As explained below, the Court concludes that no rational factfinder could find that any breach by defendants of subdivision (a) caused Banner to suffer "from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists or confidential customer information" so as to support an award of damages to Banner on Counts One and Two. [2] *American Inst.,* 682 F.2d at 387 (citations and quotation marks omitted). The Court further concludes that no injunctive relief is warranted with respect to subdivision (a).

In support of defendants' summary judgment motion, Wicks' Statement of Material Facts states, with full support in his deposition testimony, that while employed at Banner, Wicks "had no customer accounts for which he was responsible and did not directly make sales." Rather,

---

[2] Banner does not claim that it " is exposed to special harm because of the unique nature of the employee's services." *American Inst.*, 682 F.2d at 387 (citation omitted). The Court addresses good will in its discussion of subdivision (c).

Wicks "provided support to the Banner sales team, such as hiring administrative staff, deciding which vendors to pay, [and] assembling and forwarding internal paperwork[.]"  He also attended trade shows with other Banner salespeople, served as a point of contact with manufacturers, and assisted in pursuing new product lines.  He had no sales responsibilities in the Malta, New York area for Banner, and did not call on GlobalFoundries for Banner.  Wicks' Statement of Material Facts further states as follows:

> 35. When Mr. Wicks began working in Oregon in 2009, splitting his time between Banner and the engineering firm, he began using a personal hard drive to transport Banner electronic documents, for ease of use. Mr. Wicks also had a personal back-up hard drive, to which some of these Banner documents were saved.  After he left Banner, Mr. Wicks inadvertently failed to delete the Banner documents contained on these drives.
> ***
> 37. Mr. Wicks has not accessed or used any Banner data, either on his personal hard drives or otherwise, apart from reviewing travel expense information in connection with a motion for this litigation.  Mr. Wicks has not disclosed or used any other Banner confidential information since leaving Banner.

(Citations to record omitted.)  In his deposition, Wicks testified that he did not discuss anything about Banner with anyone that he worked for after leaving Banner; that he last saw Banner's customer list while he was still working at Banner; that while at Banner, he was exposed to information which could give a competitive advantage to another integrated high purity distributor; that "if [Harrington] was thought of as a competitor [of Banner], it was a minor competitor"; that his sales experience is focused on high purity gases; that to his knowledge Harrington did not sell materials for high purity gases; and that since he started with Banner in 2005, he knew that Harrington was a distributor for Asahi.  He stated that at Harrington he calls on three New York State accounts – GlobalFoundries, SUNY Albany, and IBM Fishkill – and that while at Banner he was "never primary salesman for any of those three accounts."  He

testified that he never called on the GlobalFoundries account when working at Banner; indeed, GlobalFoundries didn't exist until after he left Banner, and he had no role with GlobalFoundries's predecessor, M & W. He became familiar with the high purity and ultra high purity components industry in previous positions before he began working at Banner.

In opposing the motion, Banner describes the confidential information available to Wicks during his employment at Banner as follows:

10. While he was employed at Banner, Wicks confidentially discussed the acquisition of a new line for Banner.

11. While he was employed at Banner, Wicks prepared sales register summaries for the benefit of Banner's owners. Certain information contained within the sales register summary was confidential and was not distributed to Banner's branches.

12. While he was employed at Banner, Wicks prepared New England sales registers for the benefit of Banner's owners. These registers reflected the names of Banner's customers, purchase order numbers, total order amounts, total gross margins and the dollar amount for each manufacturer.

13. While he was employed at Banner, Wicks assembled company-wide forecasts that were viewed only by him and Banner's owners.

14. While he was employed at Banner, Wicks received a document which set forth company-wide tracking of Banner's monthly sales and the margins for those sales. This document was shared only with Wicks and not Banner's branches.

15. When he was employed at Banner, Wicks participated in confidential meetings with Banner's owners wherein they discussed Banner's priorities, company-wide approach and company-wide direction.

16. When he was employed at Banner, Wicks reviewed Banner's product lines, attended training sessions at its manufacturer's facilities, reviewed manufacturer's catalogs and attended sales meetings at which he learned confidential information that he would consider providing an advantage to a competitor

17. When he was employed at Banner, Wicks was present for discussions concerning the specifics of the products that Banner sold and the strategies on selling them. In particular, Wicks was given a confidential PowerPoint presentation that focused on product line pitches to manufacturers represented by Banner, and said presentation (among other confidential data) is probably on the hard drive that Wicks took from Banner. The confidential PowerPoint presentation, if placed in the hands of Banner's competitor, would be detrimental to Banner.

-11-

18. When he was employed at Banner, Wicks twice accessed Sharepoint, a software package that was established on Banner's internal intranet. Sharepoint was password-protected, and Wicks signed a confidentiality agreement in order to access Sharepoint. Sharepoint contained information concerning Banner's manufacturers, pricing information and information about Banner's competitors. Banner's internal intranet allowed Banner to share its successes, training material, competitive information about competing products as well as the distributors against which it competed.

19. In the performance of his job at Banner, Wicks used the identities of Banner's current and potential customers, the identities of manufacturers represented by Banner, Banner's sales goals and projections, the prices at which Banner purchased products, discounts on products that Banner distributed, Banner's sales and gross profits and Banner's reports of sales transactions.

(Citations to record omitted.) Banner claims that "Banner's customer and vendor base, pricing and marketing strategies and sources of revenue are virtually unchanged since Wicks was last employed by Banner."

With respect to manufacturers and representatives with which Wicks developed relationships while working at Banner, Banner's Statement of Material Facts asserts, based on record evidence:

23. Before Wicks worked at Banner, he did not have a relationship with representatives of certain manufacturers, such as Ralph Reyes at Ametek, Inc. [and] Paul Hoynack at Carten Controls Ltd.[.]

24. Before Wicks worked at Banner, he did not have a relationship with any of the representatives of Asahi.

25. Following the commencement of his employment relationship at Harrington, Wicks has been in contact with Ralph Reyes at Ametek, representatives of Carten and all representatives of Asahi to whom he was introduced while employed by Banner. Asahi is a manufacturer with which Wicks regularly interacts as part of his sales territory which includes the GlobalFoundries project.

(Citations to record omitted.). Wicks acknowledges that since starting work at Harrington, he has been in contact with Ralph Reyes (at Ametek), Dan Anderson, Joe Durning, and Adam Herbert (at Asahi), and Jorge Paz and Pat Reilly (at Carten Controls, Ltd. ("Carten")). Wicks testified at

-12-

his deposition as follows:

> Q Of all the manufacturers that were represented by Banner during your tenure at Banner, with which of those manufacturers do you currently interface in your tenure with Harrington?
> ***
> A Well, Asahi dealt with Banner and I deal with Asahi. Plastimatic used to deal with Banner and I deal with Plastimatic. There were meetings with George Fisher when I was at Banner about expanding or taking on distribution products. As Banner acquired the Valex line, the distribution of the Valex line, because Valex had a relationship with George Fisher, and I deal with George Fisher on a limited basis for industrial valves working for Harrington.

There is also evidence that while working at Banner, Wicks became acquainted with Steve Simon at Valex Corp. and that, while working at Harrington, Wicks suggested to Douglas R. Hodge, II, Managing Director of Harrington Pure (a group of high purity specialists within Harrington) that he contact Steve Simon. Hodge testified:

> Q Did you initiate the discussion with Mr. Wicks about Carten, Ametek and Tescom?
> A Yes.
> Q And when you initiated the discussion with Mr. Wicks about these product lines, did you understand that Mr. Wicks had dealt with these product lines when he was with Banner?
> A Yeah. I guess so, but it wouldn't matter whether they were with Banner or not. This was just a discussion to have about some of these products because I know these product lines, and I know a lot of the people that are in these organizations because I have been in this business as long as Ken has. So Valex, Tescom – I have competed against Tescom. I have competed against Valex with other product lines in my history. So they were not unknown to me. And in the discussions I had with Ken Wicks would not have been because he worked at Banner or he had represented them at Banner. It was product lines I was interested in pursuing because they are good product lines.
> Q Well, I understand from your earlier testimony that when we were talking about Valex that Mr. Wicks introduced you to or gave you the name of Steve Simon with whom you had not interacted before.
> A Right.
> Q With respect to the other manufacturers such as Carten, did Mr. Wicks give you names of individuals with whom to interface?
> A So Carten, I knew Pat Reilly from a previous relationship in this industry. I worked – I have worked with Pat in several other situations in the past. So

that was not a new name to me or he had to introduce me to Pat, who's the sales manager for Carten.

Q What about Jorge Paz?

A I had met Jorge when he was with Banner.

Q Had you met Pat through Banner?

A No.  I met him in a previous company called Metron.

Q Did Mr. Wicks introduce you to anybody or contacts at Tescom?

A No.

Q Did Mr. Wicks introduce you to anybody at Ametek?

A No.

Q Did you and Mr. Wicks ever have conversations or communications of any kind concerning Banner's pricing or price points?

A No.

Q Did you ever have conversation with Mr. Wicks or communications of any kind about Banner's sale strategies or cost points?

A No.

***

Q Have you ever asked or instructed Mr. Wicks to set up any meetings with prospective customers?

A No.

Q Have you ever asked or instructed Mr. Wicks to set up meetings with manufacturers that Harrington seeks to represent?

A I might have asked him to do that with Carten.

Q Anyone else?

A No.

Q Why did you ask them to do it with Carten?

A Because he has a personal relationship with Jorge Paz.

Q Any other reasons?

A No.

The record evidence regarding the named manufacturers and representatives other than Asahi and Carten, viewed in the light most favorable to Banner, does not support a finding that Wicks divulged confidential information or otherwise violated subdivision (a), nor does it raise a question of fact in the face of Wicks' evidence that he has not disclosed or used any Banner confidential information since leaving Banner.  The Court discusses Asahi and Carten in more detail below.

In support of its position that Wicks violated subdivision (a) of the restrictive covenants

-14-

by divulging to Harrington Banner's "methods of conducting or obtaining business, confidential information or trade secrets," Banner relies heavily on two events: (1) Asahi gave Harrington a New York distributorship and rejected Banner's bid for a New York distributorship; and (2) Harrington became a distributor for Carten Controls, Ltd. ("Carten") in areas where Banner already had non-exclusive distributorships. Banner speculates that these two events resulted from Wicks' improper use of Banner's confidential information. As discussed below, the record does not support Banner's position regarding Asahi and Carten.

### *Asahi/America, Inc.*

Asahi is a major manufacturer of industrial valve and piping systems. In opposition to defendants' summary judgment motion, Banner relies most heavily on the fact that Asahi chose Harrington as a New York distributor and rejected Banner's bid to become a New York distributor for Asahi's products. Indeed, Banner's expert witness on damages, Dennis Stone, relies entirely on Banner's alleged losses arising from Banner's inability to sell Asahi products in New York. Despite exhaustive discovery, however, Banner has uncovered no support for its contention that Wicks used Banner's confidential information to assist Harrington to obtain the Asahi distributorship or to cause Asahi to reject Banner.

It is undisputed that Asahi had used F.W. Webb as a distributor in New York for many years; that Banner was not a distributor for Asahi in New York during Wicks' employment at Banner; and that in late 2010 Banner expressed to Asahi an interest in becoming a distributor of Asahi's products in New York, in particular for a new facility being built by GlobalFoundries in Malta, New York. Banner asserts in its Memorandum of Law (with references to its Statement of Material Facts, which cites record evidence):

-15-

Wicks was entrusted with confidential information concerning the GlobalFoundries project (a semiconductor fabrication plant to be, and now, built in Malta, New York). For example, Wicks knew that Banner sought to expand into the territory of, and to obtain authorization to have onsite offices and warehousing at, GlobalFoundries. Wicks also knew that Banner submitted product and manufacturer information to the engineering firm responsible for the GlobalFoundries specifications. Wicks worked on a Business Plan for New England and New York that included a section regarding GlobalFoundries. According to the Business Plan, Wicks had "strategic account responsibility in ... New York...", which meant that he was asked to provide advice on accounts in New York. Wicks wrote a memorandum which stated the customers on which Banner was "focusing." Wicks received a memorandum entitled "Plan for Expansion of Sales for Asahi America" which addressed a "unique time" for Asahi ... to "improve [its] northeast sales team by adding Banner ... to sell UHP piping materials in ... New York." Wicks was a member of Banner's "Tri-State" team, which included New York.

(Citations to record omitted.)

In his deposition, Wicks testified:

> Q Were you provided with any information or data while you were at Banner that you considered proprietary or confidential with respect to the GlobalFoundries project?
> A Not that I recall.
> Q Were you provided with any information while you were at Banner that was either known by you or the Richard family and no one else with respect to the GlobalFoundries project?
> A Not that I recall.
> Q Did you know anything about Banner's marketing efforts or strategies with respect to the Global foundries project when you worked at Banner?
> A I knew it was their intent to have a trailer on site.

He stated that he had no specific dealing with GlobalFoundries while working at Banner. He further testified regarding his time at Banner:

> Q Did you learn who Banner's customers were with respect to the GlobalFoundries Project?
> A No.
> Q Did you learn the names of any decision makers with respect to the Global Foundries Project?
> A No.
> Q Did you learn any specification information whatsoever in connection with

-16-

the GlobalFoundries Project?

A Not that I recall.

Q Did you learn any of Banner' s pricing strategies with respect to the Global Foundries Project?

A No. I don't think – it was too early for pricing, as far as I know.

Banner deposed Adam Herbert, Business Development Manager at High Purity Products, a division of Asahi. Regarding Asahi's decision to give New York distributorship rights to Harrington and to deny them to Banner, Herbert testified:

Q Was Banner being considered to be an additional distributor for the New York market, as of late spring or into June 2011?

A Not at that time. They had – they were being considered prior and then during the spring, there was no action.

Q When you say "they were being considered prior" what do you mean by that?

A Prior to that time, Banner had requested access – or requested New York distribution rights. We had expressed to them a willingness to set them up as a distributor and we had put in place some milestones, in order for that to become a possibility and that occurred, I believe, in 2010.

Q What types of milestones were set in place for Banner?

A To have either a job site or local branch. That branch needed to be staffed with full-time employees, specifically not people coming in remotely every other week and, you know, stocking material, assign products at the branch. And then once those milestones were achieved, we were to have an on-site meeting, visit their branch and meet their people at which point, you know, final decisions could be made and we could move forward.

Q These are milestones that were established in 2010?

A I believe it was in early fall 2010.

Q With whom were you dealing with Banner on these topics?

A This was with Eric Richards [Banner's Vice President] and it was on a conference call, as well as I think – I believe another follow-up private conversation between me and Eric.

Q Did Banner go ahead, as far as you know and start to meet these milestones that you've just laid out for us?

A They did not. Eric contacted me in end of June 2011 and indicated that they had accomplished some of these milestones and that they wanted to have a meeting at [an upcoming trade show in July 2011,] Semi Con West.

Q So, after the milestones were established in the fall of 2010, I believe you said, was there any activity between the fall of 2010 and June 2011, when Mr. Richard contacted you?

A Yes. Eric contacted me either in December or January. It was kind of, you

-17-

know, middle winter and informed me that they were having delays and complications establishing a job site trailer.

***

Q So, the next thing that happens is in June 2011, Mr. Richards says that he wants to meet with you at Semi Con West?

A Correct.

Q By the time Mr . Richards says to you in June 2011 that he wants to meet with you at Semi Con West, had Asahi already made the decision to go with Harrington, as its new distributor?

***

A Yes.

Q Was the door still open for Banner to serve as a co-distributor of Harrington for the New York market?

***

A Potentially in the early spring, but by the time June – June rolled around, that was not a possibility.

Q Had Banner been notified by you or anyone else at Asahi that it was not a possibility that Banner would serve as a distributor of Asahi products in the State of New York?

A Not – not in – not prior to July.

Q What happened in July 2011 in that regard?

A We met with Banner, at the Semi Con West trade show. And allowed them to present their proposal and indicated a concern and hesitancy to move forward and at that show we set up a conference call or the need to have a follow-up conference call in a couple weeks.

Q What was the concern that you believe was articulated to Banner at Semi Con West?

A I forget exactly how we stated it, but verbally we acknowledged that there was going to be an issue setting them up as a distributor.

***

Q So, is it your testimony that Harrington had had its branch established by – let me ask it. By what point in time do you believe the Harrington branch was established in the New York region?

A In – in early June they had placed their first stocking order with us.

Q So, is it your testimony that by early June the branch was established?

A Yeah, it was set up in our system and they had placed a stocking order.

Q After the Semi Con West conference in July 2011, did you then have a conference call with Eric and/or Bud?

A We did.

Q When was that?

A It was one of the last weeks in July. It was maybe two, two weeks or so after the Semi Con West trade show.

Q What happened?

A We informed them – it was – it was a conference call between Eric, Bud,

-18-

myself and Dan Anderson and we informed them that we were no longer interested in setting them up as a distributor for New York[.]

\*\*\*

Q Was there any discussion about Mr. Wicks, during this conference call?

A Yes, there was.

Q What was that about?

A Bud Richards brought up Ken Wicks during the conference call.

Q What did Mr. Richards say to you, about Mr. Wicks, during the conference call?

A He asked us if this has to do with – he asked us if the decision had to do with Ken Wicks.

Q By July, when this conference call took place, in late July 2011, did you understand Mr. Wicks to be interviewing with Asahi or an employee of Asahi, at that point?

Q I'm sorry. Of Harrington.

A I understand him to be interviewing.

Q So, what was your response to Mr. Richard, when he asked that question of you?

A When he asked that question it was confusion, wondering why he was asking about Mr. Wicks, when we were talking about something that had nothing to do with Mr. Wicks and I believe I – I asked Bud. I said, "Why are you talking about Mr. Wicks? This has nothing to do with this and can we get back to the matter at hand?" ...

Q Was there any further discussion about Mr. Wicks, during this conference call?

A No.

A It was left that we were not going to set them up as a New York distributor. That in the upcoming weeks or months, I would pay them a courtesy visit to their branch and come see their new facility and we had asked them not to move inventory into the region.

Q At what point in time, did you first learn that Mr. Wicks became employed by Harrington?

A It was in the days after the Harrington open house.

Q In August 2011?

A Yes.

Q Since late August 2011 all the way through to today, have you had conversation or communications with Mr. Wicks about why Harrington was selected as Asahi's distributor in New York?

A I actually think no, we have not discussed that.

\*\*\*

Q Do you have any doubts about that?

A Yeah, I don't – I don't think I've had to explain – when he came on board, it was already an established decision.

Q Did Mr. Wicks ever ask you how the decision came to be?

-19-

A No.

Q Did Mr . Wicks ever ask you or did you ever tell Mr. Wicks why Banner was not selected as a distributor for GlobalFoundries?

A No.

\*\*\*

Q Did Mr. Wicks' prospect of hiring by Harrington back in July 2011 factor into the thought process or decision making process for the selection of Harrington over Banner?

A Absolutely not.

Banner also deposed Robert Howard Bacon, a representative of Harrington. Bacon testified that in January or February 2011 Harrington decided to lease a warehouse in Malta, New York to pursue an Asahi distributorship for the GlobalFoundries project. Asked what role Wicks played "with respect to Harrington's access to the Asahi line in the GlobalFoundries project," Bacon answered, "None. Nothing." He added that, by August 22, 2011, when Wicks was offered employment by Harrington, Harrington was "secure that Harrington Plastics was an Asahi/America full-line pipe valve and fitting high-purity distributor in Malta, New York with physical location, so that was prior to any conversations with Ken Wicks."

In addition, Banner deposed Harrington's Chief Executive Officer, James Warren Swanson. Asked whether he viewed Banner as a competitor, Swanson stated:

> They're not a competitor, I've never viewed them as a competitor. They sell stainless-steel products and we don't even enter into the stainless-steel business, other than when asked to by certain manufacturers. So to me I could name 30 competitors before I'd even get – Banner wouldn't hit the top 100, probably, as a competitor. We compete with them in one area and one area only, and that's Salt Lake and that's on one particular product line, and I don't even view them as a competitor there.

In his affidavit on this motion, Eric Richard, Banner's Vice President, states:

> 20. When Wicks was employed by Banner, Banner had ongoing discussions with Asahi/America, Inc. ("Asahi"), a manufacturer represented by Banner in certain geographic regions in the United States, to serve as a distributor of its products in New York. These discussions commenced in approximately July,

-20-

2009. Specifically, on July 20, 2009, Wicks forwarded a Request for Quotation from a contractor in order to quote Asahi components for GlobalFoundries. Between July 22, 2009 and July 31, 2009, a series of e-mails were exchanged between various Banner offices and suppliers, including Asahi, quoting products for the GlobalFoundries project.

21. On August 4, 2009, I sent an e-mail to Asahi in which I expressed Banner's willingness to reinvest profit from the base build portion of the GlobalFoundries project in order to fund onsite operations and that I would relocate from Utah to New York in order to run that operation. On the same date, I participated in a conference call with several of Asahi's representatives, during which Asahi's representatives stated, in part, that Banner would be the distributor of its PVDF line for the tool hookup phase (which follows the base build phase) of the GlobalFoundries project if Banner "stood down" and allowed other distributors (F.W. Webb Company and Corrosion Products and Equipment, Inc.) to sell its line in the base build phase of the GlobalFoundries project. On an unknown date shortly following August 4, 2009, I accepted Asahi's proposal.

22. Banner's request to distribute Asahi's products in New York was not rebuffed during Wicks' tenure with Banner.

23. During Banner's discussions with Asahi, Asahi did not impose a series of milestones upon Banner that it needed to complete before Asahi would consider granting New York distribution rights to Banner.

24. In December 2010 or January 2011, I did not tell any representative of Asahi that Banner was having problems setting up our onsite operations at GlobalFoundries. In the ensuing months, I continued to communicate with representatives of Asahi concerning Banner's ongoing efforts to secure distribution rights to Asahi's products in New York.

25. On August 20, 2011, I sent an e-mail to Asahi in an effort to persuade Asahi that Banner had the ability to distribute Asahi's products in New York.

26. On August 24, 2011, I received an e-mail from Asahi wherein its representative requested some time to see Banner's trailer/office in Malta, New York and, as I understood the e-mail, to discuss further Banner's distribution of Asahi's products in New York.

27. On an unknown date shortly after August 24, 2011, I met with two of Asahi's representatives at Banner's trailer/office in Malta, New York. During that meeting, we discussed, amongst other things, Banner's ability and continued desire to distribute Asahi's products in New York.

28. On September 6, 2011, I sent an e-mail to Asahi in which I expressed my gratitude for the aforesaid visit by its representatives.

29. It was not until September 12, 2011 (a date that I understand follows the commencement of Wicks' employment with Harrington) that I was first made aware by Asahi of its decision not to use Banner as a distributor in New York. At all times prior to that date, I understood and believed that Banner remained a viable distributor of Asahi's products in New York.

30. In July, 2011, there was no meeting between Asahi and Banner representatives wherein Asahi declined Banner's request to serve as its distributor in New York. As set forth above, Banner was not made aware of Asahi's decision in this regard until September 12, 2011.

31. Similarly, in August, 2011, Asahi's representatives did not meet with me in order to state or reiterate that Asahi would not allow Banner to distribute its products in New York. On the contrary, as set forth above, during the meeting between Asahi and Banner that occurred shortly after August 24, 2011, there was discussion, amongst other topics, about Banner's ability and continued desire to distribute Asahi's products in New York.

32. Given the aforesaid sequence of e-mails and meetings in August and September, 2011, Wicks' application to, and/or employment with, Harrington influenced Asahi's decision to decline Banner's request to be an Asahi distributor in New York, and this decision was in violation of the verbal agreement that Banner made when it "stood down" during the base build phase of GlobalFoundries.

(Citations to record omitted.)

The email exchange to which Eric Richard refers began on August 24, 2011, when Adam Herbert of Asahi sent an email to Eric Richard, stating: "I am going to be in NY next week, do you have time for me to drop in on Tuesday/Wednesday? I can see the trailer and we can chat about this issue further." Thereafter, the meeting took place, and on September 6, 2011, Eric Richard emailed Adam Herbert stating:

I just wanted to drop you a line and thank you for spending some time with us last week. It was good to see you guys in NY, please let me know your thoughts. We are still very excited to work together and strongly believe we can offer you and our customers, something unique.

On September 12, 2011 Adam Herbert responded:

Thanks for your time as well. At this time Asahi does not wish to add another distributor in NY due to the limited market potential. Please understand this has been a very difficult decision for the Asahi team to make. We take market potential and saturation very seriously when analyzing multiple distribution territories. We are currently navigating complex politics for getting Asahi's HP piping products approved. This has also put an additional strain on the High Purity market potential which is Banner's core focus.

-22-

We know that Banner opened NY with the expectation of Asahi's support. As we explained the past several months have been extremely dynamic with distribution changes, sales successes and jobsite politics. It was never Asahi's intention to mislead Banner and we have had to react to market changes.

Pointing to the above evidence, Banner argues in its Memorandum of Law:

In the summary judgment context, it is inappropriate to determine the role played by Harrington's hiring of Wicks on Asahi's decision to deny Banner of the ability to distribute its products in New York. Such a determination goes far beyond the Court's function of issue finding and can only properly be made after the facts are presented and evolve at trial. In the face of evidence that: Asahi did not impose milestones upon Banner that it needed to complete; Banner did not tell Asahi that it was having problems setting up its onsite operations at GlobalFoundries; Banner communicated with Asahi's representatives concerning its efforts to secure distribution rights to Asahi's products in New York; Banner attempted to persuade Asahi that it had the ability to distribute its products in New York in August 2011; Asahi requested time to see Banner's facilities in Malta, New York in August 2011; a meeting took place in late August 2011 to discuss Banner's ability and desire to distribute Asahi's products in New York; and Banner was initially notified on September 12, 2011 that Asahi decided not to use Banner as its distributor in New York, the defendants are impermissibly requesting that this Court discredit all of the foregoing evidence and instead credit the testimony of their witnesses and Asahi's representative. Such a weighing of evidence is not appropriate on summary judgment.

(Citations to record and case citations omitted.)

On thorough review of the record, the Court finds no factual support for a finding that Wicks used or disclosed Banner's confidential information, or that any such use, disclosure, or other improper conduct caused or contributed to Harrington's obtaining Asahi distributorship rights in New York. To the contrary, the indisputed evidence from Asahi's manager Herbert is that Harrington's branch was established in the New York region by early June 2011, when Harrington "was set up in [Asahi's ] system" and had "placed their first stocking order" with Asahi. When Wicks began employment at Harrington on August 22, 2011, the selection of Harrington as an Asahi distributor in New York "was already an established decision." When

-23-

asked, "Did Mr. Wicks' prospect of hiring by Harrington back in July 2011 factor into the ... selection of Harrington over Banner?" Herbert responded, "Absolutely not." There is no evidence to the contrary.

Banner appears to recognize the lack of evidentiary support for its argument that Wicks somehow influenced Asahi to select Harrington. In its Memorandum of Law, as quoted above, it argues instead that Wicks somehow influenced Asahi to reject Banner. Banner argues that the Court cannot properly determine on summary judgment "the role played by Harrington's hiring of Wicks on Asahi's decision to deny Banner ... the ability to distribute its products in New York." Banner relies in part on discrepancies between Herbert's testimony and that of Eric Richard, and in part on evidence suggesting that until September 12, 2011 – three weeks after Wicks began working at Harrington – Asahi still appeared to be considering Banner's bid to become a New York distributor. Even accepting the truth of all of Banner's allegations, however, and even discrediting Herbert's testimony that Wicks' relationship with Harrington had no bearing on Asahi's selection of Harrington and rejection of Banner, there is nevertheless no evidence that would permit a reasonable factfinder to conclude that Wicks used or divulged confidential information or trade secrets or otherwise acted in violation of the restrictive covenants in subdivision (a) in connection with Asahi.

*Carten Controls, Ltd.*

Banner points to the fact that, while employed at Harrington, Wicks participated in selling products manufactured by Carten. Regarding Carten, Banner's Memorandum of Law states (with citations to its Statement of Material Facts, which has record support):

> Before Wicks worked for Harrington, Harrington did not distribute any Carten products. Hodge [at Harrington Pure] had no experience selling Carten

-24-

products before he was employed by Harrington. Since November 17, 1993, Banner has distributed Carten products in several states, including some (Michigan, Mississippi and Tennessee) in which it does not have a contract with Carten to be its exclusive distributor (so-called "white zones"). However, until Wicks started working for Harrington, Banner was the only Carten distributor in those "white zone" states.

When Wicks worked at Banner, he sold Carten products and gained "plenty of knowledge" about them. After Wicks joined Harrington, he and Hodge discussed adding Carten products in Mississippi and Tennessee. Wicks developed a friendship with Jorge Paz ("Paz"), a Carten employee, when they worked at Banner. On or about November 16, 2011, Wicks attended a meeting with Hodge, Paz and other Carten representatives to see if Harrington could represent Carten in certain territories where Harrington had customers. Because Wicks was familiar with Carten, he worked with Carten to prepare a list of its valves that could be used as alternatives to the valves that were in the customer's specifications. As a result of Wicks' efforts, Carten was written into the customer's specifications. In April and June, 2012, Harrington sold Carten products in Michigan. At Carten's request, Harrington met with Carten's representatives at a trade show in the Summer of 2012. That meeting went well. Harrington desires to sell the Carten line in other territories.

(Citations to record omitted.)

Wicks testified at his deposition that, prior to joining Banner, he had relationships with Jorge Paz and Pat Reilly, his contacts at Carten. When he worked for Banner, Banner had a sales team that sold Carten; Wicks was a sales manager, not a salesman, and never directly sold Carten products to a customer. In any event, accepting the truth of Banner's allegations, there is no support for a finding that, in connection with Carten, Wicks violated his agreement in subdivision (a) of the Settlement Agreement that he "will not supply or divulge ... any of [Banner's] methods of conducting or obtaining business, confidential information or trade secrets[.]" There is nothing improper in Wicks' meeting with Paz and other Carten representatives on November 16, 2011, more than two years after leaving Banner, "to see if Harrington could represent Carten in certain territories where Harrington had customers." There is no suggestion of improper use of

-25-

confidential information in the fact that "[b]ecause Wicks was familiar with Carten, he worked with Carten to prepare a list of its valves that could be used as alternatives to the valves that were in the customer's specifications"; obviously, Wicks and Carten did not need to use Banner's confidential information to prepare a list of Carten's own valves. Nor is Banner's position aided by the fact that – two and a half years after Wicks left Banner – Harrington sold Carten products in Michigan. There is no evidence that such a sale resulted from use of Banner's confidential information; moreover, there is no evidence that would permit a reasonable finder of fact to draw the inference that it did. As a matter of law, the evidence regarding Carten does not raise a material question of fact in the face of Wicks' statement that, since leaving Banner, he "has not accessed or used any Banner data" and "has not disclosed or used any other Banner confidential information."

### _The Hard Drive_

In its Statement of Material Facts, Banner's description of the confidential information available to Wicks during his employment at Banner includes the following; "Wicks was given a confidential PowerPoint presentation that focused on product line pitches to manufacturers represented by Banner, and said presentation (among other confidential data) is probably on the hard drive that Wicks took from Banner. The confidential PowerPoint presentation, if placed in the hands of Banner's competitor, would be detrimental to Banner."

In his Statement of Material Facts, Wicks states:

> 35. When Mr. Wicks began working in Oregon in 2009, splitting his time between Banner and the engineering firm, he began using a personal hard drive to transport Banner electronic documents, for ease of use. Mr. Wicks also had a personal back-up hard drive, to which some of these Banner documents were saved. After he left Banner, Mr. Wicks inadvertently failed to delete the Banner documents contained on these drives.

-26-

***

37. Mr.Wicks has not accessed or used any Banner data, either on his personal hard drives or otherwise, apart from reviewing travel expense information in connection with a motion for this litigation. Mr. Wicks has not disclosed or used any other Banner confidential information since leaving Banner.

In his deposition, Wicks acknowledged that he considered the information on the PowerPoint presentation to be confidential and that if it were put in the hands of a competitor it would be detrimental to Banner. He added that the hard drive is accessible to him, but he doesn't look at it very often. He further testified:

Q At any point during your interview process with Harrington did you disclose to any of the people with whom you met that you had this data that you stored on the hard drive?
A Absolutely not.
Q To this day, have told anybody at Harrington that you have data of Banner on a hard drive?
A No.
Q Has anyone asked you from Harrington if you have any data from Banner?
A No.
Q Other than looking at your travel expenses, after you started to work for Harrington, have you accessed any of the other data that is on that hard drive?
A The Banner data?
Q The Banner data?
A No.

The fact that some Banner documents remain on Wicks' hard drive does not, on this record, support a finding that Wicks made improper use of such documents, nor does it raise a question of fact in this respect. Banner is, however, entitled to assurance that Wicks no longer possesses the information. Therefore, Banner is awarded the following injunctive relief: Wicks is directed to return to Banner all copies of Banner documents remaining on the hard drive and to delete all such information from the hard drive, and counsel are directed to facilitate this matter so that Wicks can retain whatever of his own material is on the hard drive.

*Conclusion - Subdivision (a)*

On a thorough review of the record, resolving all ambiguities and drawing all factual inferences in favor of Banner, the Court concludes that no rational factfinder could conclude that Wicks breached subdivision (a) or that Banner sustained any damages resulting from any breach by Wicks of subdivision (a).  Further, in the absence of any evidence that Wicks breached subdivision (a), and in view of the fact that more than five years have passed since Wicks left Banner, injunctive relief is not necessary "to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists or confidential customer information."  *American Inst.*, 682 F.2d at 387.

### *Subdivision (c)*

Banner also relies on subdivision (c) of the Employment Agreement, which provides:

> [Wicks] agrees that for a period of (3) years following termination of this Agreement, [Wicks] shall not directly or indirectly be engaged in or become interested in or serve as officer or director or employee of any business substantially similar to that being conducted by [Banner] in any area in which [Banner] conducts business.

The three-year period has expired; thus, subdivision (c) is not enforceable by injunctive relief.  As to whether it is enforceable by an award of money damages, the Court notes that a restrictive covenant will be enforced "only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists or confidential customer information, [or] to protect the good will of the employer's business[.]"  *American Inst.*, 682 F.2d at 387 (citations and quotation marks omitted). "Only after determining that a restrictive covenant would serve to protect against such unfair and illegal conduct and not merely to insulate the employer from competition, does the reasonableness of the covenant in terms of its time, space or scope, or the oppressiveness of its operation become

-28-

an issue." *Id.* (citation and quotation marks omitted).

It is true that Wicks went to work for Harrington before the expiration of subdivision (c)'s three-year period. Even assuming, however, that Harrington's business is "substantially similar to that being conducted by [Banner]" within the meaning of subdivision (c), Banner has not shown that it sustained any damages from Wicks' taking the position at Harrington. The Court has already found no evidence that Banner sustained any harm from any use or disclosure by Wicks of trade secrets, confidential customer lists, or confidential customer information. As for goodwill, it is undisputed that while employed at Banner as its national sales manager, Wicks did not directly make sales but rather provided support to Banner' salespeople. Even accepting that, while working as a sales manager at Banner, Wicks "was in a position to affect, and tried to foster, Banner's goodwill" and tried to promote Banner's goodwill when he attended trade shows, there is no evidence that Wicks made use of Banner's goodwill when he worked at Harrington, or that Banner was harmed by any such use.

More fundamentally, there is no evidence that the prohibition in subdivision (c), as Banner would apply it here, is appropriate to protect Banner against unfair competition. Based on the record evidence, subdivision (c)'s provision that Wicks "shall not directly or indirectly be engaged in or become interested in or serve as officer or director or employee of any business substantially similar to that being conducted by [Banner]" is so broad that its purpose can only be "to insulate [Banner] from competition."[3] *Id.* Banner has not shown that Wicks possessed the

---

[3] The excessively broad reach of subdivision (c) is evident in the injunctive relief requested by Banner in the "Wherefore" clause of complaint, which asks the Court, *inter alia*, to enjoin Wicks from "engaging in, having an interest in, being employed by or being in any way connected with (as a consultant, independent contractor or otherwise) any company or entity which is a retail distributor of high purity components, including valves, vacuum fittings, tubing and gauges that are used in the high technology manufacturing industry, particularly in the semiconductor industry, anywhere in the United

type of confidential information or trade secrets that would warrant such an oppressive restrictive covenant; therefore, Banner's legitimate interests are not implicated in this regard. Thus, the prohibition in subdivision (c), as Banner would have it applied to Wicks, "conflicts with the general public policy favoring robust and uninhibited competition, and powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *Id*. at 386.

On a thorough review of the record, resolving all ambiguities and drawing all factual inferences in favor of Banner, the Court concludes that Banner is not entitled to relief under subdivision (c). Inasmuch as Banner is not entitled to relief under either subdivision (a) or (c) of the restrictive covenants, summary judgment is granted dismissing Counts One and Two.

**Count Three**

Count Three of the complaint, "Breach of the Covenant of Good Faith and Fair Dealing," pleads:

> 56. A covenant of good faith and fair dealing is inherent in all contractual relations.
> 57. By the above-described actions, Wicks has breached the covenant of good faith and fair dealing with Banner in connection with both the [Employment] Agreement as well as the Settlement Agreement.
> 58. As a direct and proximate result of Wicks' actions, Banner is suffering, and will continue to suffer, irreparable harm and damages.

"New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). "Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Id*. at 80 (quoting *Fasolino*

States through September 16, 2012[.]"

*Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992) (internal quotation marks and citations omitted)). Here, the conduct allegedly violating the implied covenant is the same conduct allegedly violating the restrictive covenants set forth in Counts One and Two. Having granted summary judgment dismissing Counts One and Two, the Court grants summary judgment dismissing Count Three.

**Count Four**

Count Four, sounding in conversion, claims:

> 60. Following Wicks' separation from Banner, he commenced work as a Technical Sales Representative for Harrington and has converted and used for his own benefit and for the benefit of Harrington certain property of Banner, including but not limited to, Banner' s trade secrets, financial and other private information,customer lists and other property of Banner.
> 61. As a direct and proximate result of Wicks' actions, Banner is suffering and will continue to suffer, irreparable harm and damages.

As discussed above, on this record no rational factfinder could conclude that Banner sustained damages resulting from any breach by Wicks of the restrictive covenants. Therefore, summary judgment is granted dismissing Count Four.

**Count Five**

In Count Five, headed "Fraud and Deceit," Banner alleges:

> 67. Wicks did not intend to comply with the terms of either the [Employment] Agreement or the Settlement Agreement and, subsequent to his execution of the Agreement and Settlement Agreement, Wicks has breached both of said Agreements.
> 68. Banner relied upon the Agreement as executed by Wicks and the representations contained therein in employing, and continuing to employ, Wicks, to train him and provide him with access to Banner's confidential information, customer lists and other private financial and other information.
> 69. Banner relied upon the Settlement Agreement as executed by Wicks and the representations contained therein in paying, and continuing to pay, Wicks the gross sum of One Hundred Thousand Dollars ($100,000.00).
> 70. Banner was reasonable in its reliance upon the representations made by

-31-

Wicks as contained in both the [Employment] Agreement and in the Settlement Agreement.

71. As a direct and proximate result of Wicks' fraud and deceit, Banner has suffered, and will continue to suffer, irreparable harm and damages.

The Court has already found that no rational factfinder could find on this record that Wicks breached the restrictive covenants or that Banner sustained harm resulting from any breach by Wicks of the restrictive covenants. Therefore, there is no basis upon which Banner could recover against Wicks on Count Five. Summary judgment dismissing Count Five is granted.

**Count Six**

Count six, headed "Interference – Harrington," states:

73. Wicks executed the [Employment] Agreement with Banner on or about August 12, 2005....

74. The terms of the [Employment] Agreement survive Wicks' separation from employment with Banner.

75. Harrington has tortiously interfered with the Agreement by hiring Wicks to work for Harrington, a competitor of Banner, in clear and direct violation of the Agreement, and by using confidential information of Banner.

76. As a direct and proximate result of Harrington's actions, Banner is suffering, and will continue to suffer, irreparable harm and damages.

Under New York law, "[t]ortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996).

Having concluded that no rational factfinder could find on this record that Wicks breached the restrictive covenants or that Banner sustained harm resulting from any such breach by Wicks, the Court finds that Banner cannot make out a claim for tortious interference by Harrington. Summary judgment dismissing the sixth cause of action is granted.

**CONCLUSION**

It is therefore

ORDERED that Banner is awarded the following injunctive relief: Wicks is directed to return to Banner all copies of Banner documents remaining on the hard drive and to delete all such information from the hard drive; and counsel are directed to facilitate this matter so that Wicks can retain whatever of his own material is on the hard drive; and it is further

ORDERED that all other relief requested is denied, and in all other respects defendants' motion (Dkt. No. 95) for summary judgment dismissing the action is granted; and it is further

ORDERED that the action is dismissed with prejudice.

IT IS SO ORDERED.

Date:   December 1, 2014
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge